UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| J'KIAH V. THOMAS,	) | |
| 	Plaintiff	) | |
| 	) | |
| v.	) | 1:19 – cv – 00015-MSM-PAS |
| 	) | |
| STATE OF RHODE ISLAND,	) | |
| PATRICIA COYNE-FAGUE,	) | |
| ASHBEL T. WALL	) | |
| JOHN DOE, JOHN DOE	) | |
| 	Defendants	) | |

MEMORANDIUM AND ORDER

Mary S. McElroy, United States District Judge.

This matter is before the Court on the Defendants' Motion to Dismiss (ECF No. 32) this *pro se* Amended Complaint. (ECF No. 31). There is a Magistrate's Report and Recommendation recommending that the Motion to Dismiss be granted as to all defendants. (ECF No. 33). For the reasons that follow, the Report and Recommendation is adopted in part but not in its entirety. The Motion to Dismiss against all defendants in their official capacities is GRANTED. It is also GRANTED with respect to all claims against defendant Wall.[1] However, the Motion is DENIED with respect to all other defendants sued in their individual capacities.

---

[1] Defendant Wall has yet to be served with the Amended Complaint, which was filed on August 22, 2019 (ECF No. 31). According to the return of service attached to the initial Complaint, DOC refused to accept service for him, as he had already retired from the Department of Corrections. (ECF No. 10, at 2-3). Mr. Thomas complains

1

**Parties and Jurisdiction**

The plaintiff, a state prisoner confined to the Adult Correctional Institutions ("ACI"), has sued the current Director of the Rhode Island Department of Corrections, the previous Director, and two "John Does.[2] He has filed this action pursuant to 42 U.S.C. § 1983, claiming that the defendants, in their official and individual capacities, violated his civil rights, specifically his right to be free from Cruel and Unusual Punishment as guaranteed by the Eighth Amendment to the Constitution of the United States. More narrowly framed, as described in detail below, his complaint is

---

that he does not know where Mr. Wall is located and cannot therefore effectuate service on him. The Court finds that in the absence of any specific allegations of fact concerning Mr. Wall in the Complaint, he was likely named only because of his official capacity at the time of the incident. Ms. Coyne-Fague as the current Director would have been substituted in any event. Fed. R. Civ. P. 25(d). Since more than 90 days have passed without service on Mr. Wall, it is appropriate to dismiss him as a defendant. Fed. R. Civ. P. 4(m).

With respect to service on Director Coyne-Fague, the State contended that service was not made timely. (ECF 32-1). The Magistrate concluded, however, that any fault in service was due to the Marshals' Service "fumbl[ing]" the ball and not the fault of the plaintiff. As the Director was ultimately served, and no prejudice resulted, the Magistrate recommended denying the motion to dismiss on that ground. (ECF 26 at 2, n.2.) I adopt that portion of the Report and Recommendation.

[2] It is not uncommon that a prisoner not know the name(s) of officers who he alleges are liable for some civil rights violation. So long as he demonstrates a plausible factual foundation, and provides a focused description of their actions, the defendants may continue to be identified as John Does to give the plaintiff time, through discovery, to ascertain their identities. *Doiron v. Edmark,* Civil No. 16-cv-326-PB, 2018 WL 1441841, at *1 (D.N.H. Mar. 2, 2018) (since plaintiff was given time for adequate discovery he is directed to amend the complaint to name the John Does); *Bovin Belskis v. D.T. Developers Inc.*, 1:15-cv-0091-JAW, 2016 WL 5395833 at *2 (D. Me., Sept. 27, 2016) ("Typically, discovery reveals the true identity of Jane and John Doe defendants and their exact actions."). Mr. Thomas may move to amend his Complaint to name the John Does after discovery is complete.

that prison officials failed to protect him from a known risk of physical harm and that, as a result, he suffered serious injury.

Standard of Review

As the plaintiff is proceeding *pro se*, his pleadings are to be viewed liberally and not held to the same standard as those of a represented party. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). He nonetheless must meet the requisite standard to withstand a Rule 12(b)(6) motion. *Chase v. Chafee,* No. CA 11-586ML, 2011 WL 6826504, at *2 (D.R.I. Dec. 9, 2011). "To state a claim on which relief may be granted, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). In making this determination, the court must accept a plaintiff's well-pleaded factual allegations as true and construe them in the light most favorable to him. *Id.*

Allegations

Taking the allegations in the light most favorable to the plaintiff, and drawing all reasonable inferences therefrom,[3] this story, of violence between gangs, is one not unfamiliar to this country's prisons, nor indeed to its urban streets.[4] Mr. Thomas

---

[3] This description is drawn from the pleadings and papers submitted attendant to the pending motion.

[4] Kristin Babik, Youth & Delinquency: An Anthropological View of Street Gangs, Early Intervention and Policy Implications, 29 U.Fla. J.L. & Pub. Pol'y 237, 252-53 (Spring 2019); Dale Noll, Building a New Identity: Race, Gangs, and Violence in California Prisons, 66 U.Mia. L.Rev. 847, 852-53 (Spring 2012); Julie Taylor, Racial Segregation in California Prisons, 37 Loy.L.A. L.Rev. 139, 149-50 (Fall 2003).

identifies himself as a member of the Bloods gang[5] and asserts that he was identified by the Department of Corrections as a member of that gang early in his incarceration. He states it is standard procedure at the prison to check all arriving inmates for tattoos signifying their gang affiliation, and that he has tattoos identifying him as a member of the Bloods. In recognition of that affiliation, he was issued a "yellow-stripe ID" identifying him as a member of the Bloods. Although he does not explicitly say so, a fair inference is that IDs are carried by prisoners on their person. A reasonable inference from the fact that gang affiliation is signified on the ID is that prison officials consider it important that officers coming into contact with prisoners know of their gang relationships.

On or about January 18, 2016, a fight broke out between members of the Bloods and members of the rival gang, the Crips.[6] According to the plaintiff's pleadings, he and four other Bloods members, plus four Crips members, were involved in that altercation. All nine were disciplined and all were confined to disciplinary segregation. The plaintiff himself was sentenced to five months plus 28 days of segregation. The nine were confined to two tiers of a block. The plaintiff, a Bloods member, was confined on the lower tier along with all four Crips members. The other four Bloods members were housed on the upper tier.

---

[5] Initially known as the Original Blood Family, the Bloods was formed in the early 1970's in and around Los Angeles. https://en.wikipedia.org/wiki/Bloods.

[6] The Crips gang was apparently founded not long before the Bloods and was also initially based in and around Los Angeles. Where the Bloods traditionally wear red, the Crips traditionally wear blue. "The Crips have a long and bitter rivalry with the Bloods." https://en.wikipedia.org/wiki/Crips.

All nine were on "locked and fed in" status while the incident was being investigated.

On January 22, 2016, the plaintiff claims that he was let out of his cell for a 15-minute shower with two of the Crips members who had been involved in the altercation four days previously. According to the Complaint, he was put in the shower and recreational area by the two correctional officers he has designated as "John Does." He was immediately assaulted and seriously beaten, suffering a shattered right elbow which required reconstructive surgery. The assault also resulted in the insertion of a metal plate and seven screws in his elbow, caused a permanent disfigurement and inflicted permanent nerve damage.

Mr. Thomas alleges that it is against prison protocol to allow inmates out of their cells alone in the presence of rival gang members. He maintains that the feud between the Bloods and Crips was well-known throughout the prison and, by inference, to the John Does. He also maintains that higher-ups in the DOC, presumably including Director Coyne-Fague, were well-aware of the rivalry and the history and potential for violence between rival gang members.

Finally, and significantly, Mr. Thomas maintains that his own affiliation with the Bloods was "well-known" throughout the ACI.

## § 1983 Liability for Official Capacity Actions

Before moving to the crux of the plaintiff's claim, the Court addresses the defendants' assertion that they may not be sued in their official capacity for money damages. That is correct. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109

5

S.Ct. 2304 (1989) (an official of the state, acting in his or her official capacity is not a "person" within the meaning of § 1983). As a result, "no cause of action for damages is stated under 42 U.S.C. § 1983 against a state, its agency, or its officials acting in an individual capacity." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 124 (1st Cir. 2003). As Mr. Thomas seeks only monetary damages, the counts against the three state officials in their official capacities must be DISMISSED.

**The Eighth Amendment and the Obligation to Protect**

What is left to be addressed is the crux of Mr. Thomas' Complaint: that the Director of Corrections and two unnamed John Doe correctional officers, acting in their individual capacities, failed to protect him from a known harm, demonstrating a deliberate indifference to his well-being.

The obligation of prison officials to protect a prisoner from harm, and the Eighth Amendment violation that can result from a failure to do so, is well-established. Prison officials are not responsible for every injury that a prisoner suffers at the hands of other inmates, but they do have an affirmative duty to protect them from known risks to their safety. *Farmer v Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976-77 (1994). They are responsible if they are "deliberately indifferent" to the risk, which means knowing of and disregarding an excessive risk to an inmate's health or safety. "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson,* 563 U.S. 51, 61, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011). Prison officials do not have to know or anticipate that a particular

6

prisoner will be harmed in a specific way. It is enough to know that a substantial risk of harm is presented to *some* inmate. The defendants need not know of the precise risk, or the precise harm that would result, or that the harm would befall the precise plaintiff. *Calderon-Ortiz v. LaBoy-Alvarado,* 300 F.3d 60, 65 (1st Cir. 2002) (pretrial detainee in institution that did not separate prisoners by safety needs and security risks, was sodomized by other defendants in his cell); *Cortes-Quinones v. Jimenez-*Nettleship, 841 F.2d 556, 558 (1st Cir. 1988) (upholding jury verdict where psychiatrically disturbed prisoner was transferred to a jail "so overcrowded that space per prisoner amounted to 15.5 square feet" and within a few months was found dead with his body dismembered). The risk of harm must be "substantial," but even a prison official unaware of a specific risk to a specific prisoner "may nevertheless be held liable under the Eighth Amendment if the risk was obvious and a reasonable prison official would have noticed it." *Farmer v. Brennan*, 511 U.S. 842, 114 S.Ct. 1982. Knowledge may be inferred from the obvious nature of the risk. *Id.*

The plaintiff has alleged that the rivalry between the Bloods and Crips was well-known, that there had been specific evidence of it in the brawl of four days prior, and that the affiliations of all inmates were known (not only his but lower-tier Crips as well). Prisoners do not have the keys to their own cells, nor are inmates in "locked and fed in" disciplinary status permitted to roam at will. It is a reasonable inference that correctional officers knowingly released the plaintiff and the offending Crips into the shower at the same time. If they did so with deliberate indifference to the danger presented, the plaintiff has pleaded sufficiently to state a claim for relief. Similar

7

claims made after similar assaults are plentiful, even in this Circuit alone. *See Giroux v. Somerset County*, 178 F.3d 28, 33-34 (1st Cir. 1999) (where a meeting with a police detective set up by prison officials may have given the impression that the plaintiff was "snitching," following which the plaintiff was put on "cell feed," his being placed in an unguarded common visiting room with an inmate who had threatened him could enable a jury to conclude liability); *King v. Dept. of Correction*, Civil Action No. 15-cv-14256-ADB, 2016 WL 7175592 (D. Mass. Dec. 8, 2016) (plaintiff was a confirmed gang member who notified guards that his cell assignment was problematic, but was beaten within minutes of his relocation by rival gang members); *Facey v. Dickhaut,* 892 F. Supp.2d 347 (D. Mass 2012) (dismissal not warranted where complaint alleged that the guards were aware of a Bloods/Gangster Disciplines feud, that there was a policy of keeping known enemies apart, and where Bloods member plaintiff was assigned to a housing unit with Disciplines and was beaten on entering the unit).

**Conclusion**

For the reasons stated above, I find the Complaint satisfies the requirements of *Ashcroft v. Iqbal,* 556 U.S. at 678. I DISMISS former Director Wall from this lawsuit. I also DISMISS the complaint against Director Coyne-Fague and the two John Does with respect to their official capacities. I DENY the motions to dismiss

with respect to the state officials sued in their individual capacities.

IT IS SO ORDERED.

_____
Mary S. McElroy
United States District Judge


April 8, 2020